**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT KUREY, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANAVEX LIFE SCIENCES CORP., and CHRISTOPHER MISSLING,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Scott Kurey ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Anavex Life Sciences Corp. ("Anavex" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Anavex securities between November 26, 2025 and August 28, 2026 inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

[1] Unless otherwise stated, all emphases are added and internal citations are omitted. Formatting from quoted material may be altered.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Anavex securities during the Class Period and was economically damaged thereby.

7. Defendant Anavex's principal executive offices are located at 630 5th Avenue, 20th Floor, New York, NY 10111 and it is incorporated in Nevada. The Company's common stock trades on the Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "AVXL".

8. Defendant Anavex describes itself as follows:

> [Anavex] is a publicly traded biopharmaceutical company dedicated to the development of novel therapeutics for the treatment of neurodegenerative, neurodevelopmental, and neuropsychiatric disorders.

9. Defendant Christopher Missling served as the Company's Chief Executive Officer, President, and as a director on the Board of Directors (the "Board") from the beginning of the Class Period until his termination for cause on April 30, 2026.

10. Defendant Missling is referred to herein as the "Individual Defendant."

11. The Individual Defendant:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. Anavex is liable for the acts of the Individual Defendant and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14. Anavex and the Individual Defendant are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

15. On November 25, 2025, the Company filed its Annual Report on Form 10-K for the Fiscal Year ended September 30, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Missling attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

16. The SOX certification itself was false as a result of Defendant Missling's misconduct, which caused him to be fired for cause by the Board of Directors (the "Board"), and caused the Company to delay future quarterly filings. Further, the Company later revealed that it had deficient internal controls as a result of Defendant Missling's misconduct.

17. The 2025 Annual Report contained the following statements:

> ***Disclosure Controls and Procedures***
>
> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that material information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, our chief executive officer and our principal financial officer, to allow timely decisions regarding required disclosure.
>
> We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13(a)-15(e) under the Exchange Act. ***Based on this evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2025***.
>
> ***Management's Annual Report on Internal Control over Financial Reporting***
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our Principal Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").
>
> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> ***Based on this evaluation, our management concluded that our internal controls over financial reporting were effective as of September 30, 2025.***

The effectiveness of our internal controls over financial reporting as of September 30, 2025 has been audited by Grant Thornton LLP, an independent registered public accounting firm, as stated in their report which appears in this Annual Report on Form 10-K.

18. The statement in ¶ 17 was materially false and misleading at the time it was made because Anavex had Deficient internal controls as a result of Defendant Missling's misconduct.

19. The 2025 Annual Report contained the following risk disclosure:

***The regulatory approval processes of the FDA, EMA and comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable, which could lead to our inability to generate product revenue.***

The time required to obtain approval by the FDA, EMA and comparable foreign regulatory authorities is unpredictable, typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the type, complexity and novelty of the product candidates involved. Seeking foreign regulatory approvals could result in significant delays, difficulties and costs for us and may require additional preclinical studies or clinical trials which would be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our product candidates in those countries. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions, which may cause delays in the approval or the decision not to approve an application. Regulatory authorities have substantial discretion in the approval process and may refuse to accept any application or may decide that our data are insufficient for approval and require additional preclinical, clinical or other data. Satisfying these and other regulatory requirements is costly, time consuming, uncertain and subject to unanticipated delays. Our failure to obtain regulatory approval in any country may delay or have negative effects on the process for regulatory approval in other countries. Even if we eventually complete clinical testing and receive approval of any regulatory filing for our product candidates, the FDA, EMA and comparable foreign regulatory authorities may approve our product candidates for a more limited indication or a narrower patient population than we originally requested. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, our target market will be reduced and our ability to realize the full market potential of our product candidates will be harmed.

Applications for our product candidates could fail to receive regulatory approval for many reasons, including but not limited to the following:

- the FDA, EMA or comparable international regulatory authorities may disagree with the design, implementation or results of our clinical trials;
- the FDA, EMA or comparable international regulatory authorities may determine that our product candidates are not safe and effective, only moderately effective or have undesirable or unintended side effects, toxicities or other characteristics that

preclude our obtaining marketing approval or prevent or limit commercial use;

- the population studied in the clinical program may not be sufficiently broad or representative to assure efficacy and potency and safety in the full population for which we seek approval;
- the FDA, EMA or comparable international regulatory authorities may disagree with our interpretation of data from preclinical studies or clinical trials;
- the data collected from clinical trials of our product candidates may not be sufficient to support the submission of a Biologics License Application, New Drug Application or other submission or to obtain regulatory approval in the United States or elsewhere;
- we may be unable to demonstrate to the FDA, EMA or comparable international regulatory authorities that a product candidate's risk-benefit ratio for its proposed indication is acceptable;
- the FDA or comparable international regulatory authorities may fail to approve the manufacturing processes, test procedures and specifications or facilities of third-party manufacturers with which we contract for clinical and commercial supplies; and
- the approval policies or regulations of the FDA, EMA or international foreign regulatory authorities may significantly change in a manner rendering our clinical data insufficient for approval.

In order to market any product candidates outside of the United States, we must establish and comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy and potency and approval standards. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country.

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, government shutdowns, including as a result of budget delays or other circumstances like the COVID-19 pandemic and statutory, regulatory and policy changes. Average review times at the agency have fluctuated in recent years as a result. This lengthy approval process, as well as the unpredictability of the results of clinical trials, may result in our failing to obtain regulatory approval to market any of our product candidates, which would significantly harm our business, results of operations and prospects.

20. The statement in ¶ 19 was materially false and misleading at the time it was made because it omitted that the Company's path to regulatory approval was made materially more challenging due to misconduct by Defendant Missling which, as the Company later revealed, led to the Company actively took steps to disincentivize regulatory compliance.

21. The 2025 Annual Report contained the following risk disclosure:

> ***Obtaining and maintaining regulatory approval of blarcamesine or any future product candidates in one jurisdiction does not mean that we will be successful in obtaining regulatory approval of those product candidates in other jurisdictions.***
>
> Obtaining and maintaining regulatory approval of blarcamesine and any future product candidates in one jurisdiction does not guarantee that we will be able to obtain or maintain regulatory approval in any other jurisdiction, while a failure or delay in obtaining regulatory approval in one jurisdiction may have a negative effect on the regulatory approval process in others. Approval procedures vary among jurisdictions and can involve requirements and administrative review periods different from each other, including additional preclinical studies or clinical trials, as clinical trials conducted in one jurisdiction may not be accepted by regulatory authorities in other jurisdictions. In many jurisdictions outside the U.S., including Canada, and certain jurisdictions in the EU, a product candidate must be approved for reimbursement before it can be approved for sale in that jurisdiction. In some cases, the price that we intend to charge for our products is also subject to approval.
>
> Regulatory authorities in jurisdictions outside of the U.S. have requirements for approval of product candidates with which we must comply prior to marketing in those jurisdictions and such regulatory requirements can vary widely from country to country. Obtaining other regulatory approvals and compliance with other regulatory requirements could result in significant delays, difficulties and costs for us and could require additional preclinical studies or clinical trials, which could be costly and time-consuming and could delay or prevent the introduction of our products in certain countries. The foreign regulatory approval process involves all of the risks associated with FDA approval. We do not have experience in obtaining regulatory approval in international markets or within the United States. If we fail to comply with the regulatory requirements in international or domestic markets and/or obtain and maintain applicable marketing approvals, our target market will be reduced and our ability to realize the full market potential of blarcamesine or any future product candidates will be harmed.

22. The statement in ¶ 21 was materially false and misleading at the time it was made because it omitted that the Company's path to regulatory approval was made materially more challenging due to misconduct by Defendant Missling which, as the Company later revealed, led to the Company actively took steps to disincentivize regulatory compliance.

23. On February 9, 2026, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending December 31, 2025 (the "Q1 2026 Report"). Attached to the Q1 2026 Report was a certification pursuant to SOX signed by Defendant Missling attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

24. The SOX certification itself was false as a result of Defendant Missling's misconduct, which caused him to be fired for cause by the Board of Directors (the "Board"), and caused the Company to delay future quarterly filings. Further, the Company later revealed that it had deficient internal controls as a result of Defendant Missling's misconduct.

25. The Q1 2026 Report contained the following statement regarding disclosure controls and procedures:

> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that material information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, our chief executive officer and our principal financial officer, to allow timely decisions regarding required disclosure.
>
> We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Exchange Act, as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2025***.

26. The statement in ¶ 25 was materially false and misleading at the time it was made because Anavex had Deficient internal controls as a result of Defendant Missling's misconduct.

27. The statements contained in ¶¶ 15, 17, 19, 21, 23, and 25 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Anavex lacked adequate internal controls; (2) Anavex

understated its potential regulatory challenges as a result of misconduct by former CEO Christopher Missling; and (3) as a result, Defendants' statements about Anavex's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

28. On May 6, 2026, Anavex filed a current report on Form 8-K with the SEC. It stated in part, the following:

> ***On April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors (the "Board") of Anavex Life Sciences Corp. (the "Company") terminated the employment of Christopher Missling, PhD as the Company's Chief Executive Officer for Cause*** (as defined in the Employment Agreement, dated as of June 27, 2013, between Dr. Missling and the Company, as amended and restated), ***effective immediately, for, among other things, conduct that the Special Committee believed was inconsistent with Company policy***. The Special Committee has also requested that Dr. Missling resign as a member of the Board.

29. Notably, in an accompanying press release, Anavex attempted to downplay Defendant Missling's termination, characterizing his termination as a request to resign rather than an immediate termination:

> [Anavex,] today announced that its Board of Directors has appointed the Company's former Senior Vice President of Clinical Development and current Senior Advisor, Terrie Kellmeyer, PhD, as Interim Chief Executive Officer. ***These appointments follow the departure of President and Chief Executive Officer Christopher Missling, PhD, MS, MBA, from the Company on April 30, 2026, and a request for his resignation from the Board of Directors.*** Dr. Kellmeyer will lead the Company's next phase of growth that aligns with its strategic initiatives in enhancing the clinical development programs of the Company's current portfolio.

30. On this news, the price of Anavex stock declined by 0.59% on May 6, 2026.

31. Then, after market hours on May 11, 2026, the Company filed with the SEC a notification of late filing on Form 12b-25, which stated in pertinent part the following:

> [Anavex] is unable to timely file its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2026 (the "Form 10-Q") by the prescribed May 11, 2026 due date without unreasonable effort and expense due to the circumstances described below.
>
> As previously disclosed in the Company's Current Report on Form 8-K filed on May 6, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors (the "Board") terminated the employment of Dr. Christopher Missling as the Chief Executive Officer of the Company on April 30, 2026 ***for, among other things, conduct that the Special Committee believed was inconsistent with Company Policy. On May 4, 2026, the Special Committee appointed Dr. Terrie Kellmeyer as Interim Chief Executive Officer.***
>
> Until the Special Committee and the Company complete their review of certain matters related to the termination of Dr. Missling and Dr. Kellmeyer has had sufficient opportunity to review the Form 10-Q prior to its certification and filing, the Company will be unable to complete its preparation and review of the Form 10-Q without unreasonable effort or expense. The Special Committee and the Company are working diligently to complete their review so that the Company can file the Form 10-Q.

32. On this news, Anavex stock fell $0.18 per share, or 5.55%, to close at $3.06 on May 12, 2026.

33. On August 28, 2026, after market hours, Anavex filed with the SEC an amended Annual Report on Form 10-K/A for the fiscal year ended September 30, 2025 (the "Amended 2025 Annual Report"). The Amended 2025 Annual Report stated the following in part:

> As previously disclosed in a Current Report on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on May 6, 2026, on April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors of the Company (the "Board") terminated the employment of the Company's former Chief Executive Officer ("CEO") for Cause (as defined in the Employment Agreement, dated as of June 27, 2013, between the Company and its former CEO, as amended and restated), effective immediately for, among other things, conduct that the Special Committee believed was inconsistent with Company policy. ***As a result of the review by the Special Committee, management, in consultation with the Audit Committee of the Board (the "Audit Committee"), concluded that there was a material weakness in internal control over financial reporting that existed at September 30, 2025.*** Accordingly, the Company's internal control over financial reporting as of September 30, 2025, as reported in its Annual Report on Form 10-K for the fiscal year ended September 30, 2025 (the "Original Form 10-K") was not effective. ***In addition, the Company's disclosure controls and procedures were not effective as of September 30, 2025, due to the material weakness in internal control over financial reporting as described above.***

34. The Amended 2025 Annual Report further contained the following disclosure:

Management identified deficiencies in our Control Environment and Information and Communication controls related to the historical flow of regulatory, clinical and non-financial information.

We did not maintain an effective Control Environment ***because our former CEO failed to set an appropriate tone at the top. There was a lack of transparency with the Board regarding regulatory, clinical and non-financial matters, and the former CEO failed to foster an environment which prioritized regulatory and clinical compliance and in fact took steps to disincentivize such efforts.***

***Additionally, we failed to maintain effective controls over Information and Communication as historically, our former CEO served as a principal source and decision-maker with respect to regulatory, clinical and non-financial matters and related communications. We did not maintain sufficiently independent and formalized mechanisms to ensure that regulatory, clinical and non-financial information was communicated completely and timely to our principal financial officer, the Audit Committee and the Board, and other disclosure-process participants.***

In particular, the historical process did not include certain controls that our management has subsequently determined were necessary to provide reasonable assurance regarding the completeness of regulatory, clinical and non-financial information used in our disclosure and financial reporting processes, including a formal disclosure committee (the "Disclosure Committee"), recurring functional sub-certifications, routine access by appropriate disclosure-process participants to relevant source regulatory, clinical and non-financial information, formal source-document reconciliation procedures and a documented escalation process for regulatory, clinical and non-financial information.

The material weakness resulted from an overreliance on our former CEO as the principal source and gatekeeper for regulatory, clinical and non-financial information, together with insufficient independent controls to ensure that such information was communicated completely and timely to our financial reporting and disclosure-process participants, including the principal financial officer, Audit Committee and Board.

As a result of these deficiencies, established downstream controls, including management review, legal review, Audit Committee review, Board review and executive certifications, could operate while relying on an incomplete information population, and thus were deemed ineffective. The deficiencies also increased the susceptibility of our information and communication processes to senior-management influence and management override.

Management evaluated these deficiencies individually and in combination and concluded that they represent interrelated manifestations of an entity-level control deficiency. Accordingly, management concluded that these deficiencies, in the aggregate, constitute a material weakness because there was a reasonable possibility that a material misstatement of our annual or interim financial statements or related notes would not be

> prevented or detected on a timely basis. Specifically, the deficiencies could prevent information relevant to financial-reporting and SEC disclosure judgments, disclosures and certifications from entering the financial-reporting and SEC disclosure process before downstream accounting and review controls had an opportunity to operate.

35. After market hours on August 26, 2026, Anavex additionally filed with the SEC an amended quarterly report on Form 10-Q/A for the fiscal quarter ended December 31, 2025, which stated in part the following about the Company's internal controls:

> As previously disclosed in a Current Report on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on May 6, 2026, on April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors of the Company (the "Board") terminated the employment of the Company's former Chief Executive Officer ("CEO") for Cause (as defined in the Employment Agreement, dated as of June 27, 2013, between the Company and its former CEO, as amended and restated), effective immediately for, among other things, conduct that the Special Committee believed was inconsistent with Company policy. ***As a result of the review by the Special Committee, management, in consultation with the Audit Committee of the Board (the "Audit Committee"), concluded that there was a material weakness in internal control over financial reporting that existed at September 30, 2025. Accordingly, the Company's internal control over financial reporting as of December 31, 2025, as reported in its Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2025 (the "Original Form 10-Q") were not effective. In addition, the Company's disclosure controls and procedures were not effective as of December 31, 2025, due to the material weakness in internal control over financial reporting as described above.***

36. Also on August 28, 2026, after market hours, the Company filed with the SEC its quarterly reports for the periods ending March 31, 2026 and June 30, 2026, which both contained the following disclosure regarding statements on the Company's clinical trials as well as its internal controls:

> Following a review of our clinical development strategy under new leadership, we have de-prioritized our other assets, including ANAVEX®3-71, currently in the clinical stage, and ANAVEX®1-41 and ANAVEX®1066, currently in preclinical development. Development work on these de-prioritized assets has been paused, and future development work will be contingent on additional funding for such assets or the signing of a strategic partnership for such assets. It is also possible that we may license or sell one or more of our assets.
>
> ***Following the previously disclosed termination of our former CEO in April 2026, management has determined that our disclosure controls and procedures and our***

> ***internal controls over financial reporting were not effective as of September 30, 2025, December 31, 2025, March 31, 2026 and June 30, 2026***, which is further described in Part II, Item 4 of this Quarterly Report on Form 10-Q. ***As we align with the FDA on a clear, data-driven regulatory and clinical development strategy for ANAVEX 2-73 for early AD, Rett syndrome and Fragile X syndrome, we will obtain guidance from the FDA on the extent to which the efficacy data from our past clinical trials can be applied to our clinical development strategy,*** and, to the extent such guidance is relevant to our ongoing development plans, we expect to provide information on how this efficacy data is viewed by the FDA. ***In light of the foregoing, investors should rely only on the descriptions of our clinical trials, including for our de-prioritized assets, contained in this Quarterly Report on Form 10-Q (including the description below of the CHMP's Withdrawal Assessment Report on our submission to the EMA relating to ANAVEX 2-73 as an add-on therapy for early Alzheimer's disease) and on any future updated information***.

37. On this news, Anavex stock fell $0.19 per share, or 6.35%, to close at $2.80 on August 31, 2026, the subsequent trading day.

38. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Anavex securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

41. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

45. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

46. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

52. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

53. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

54. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

55. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

56. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

57. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

58. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

60. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

61. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

62. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2026

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*